UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JEANETTE D. NELSON,                           CIVIL NO. 05-1284 (DWF/JSM)

      Plaintiff,

v.                                            REPORT AND
                                              RECOMMENDATION
JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.


The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 12] and Defendant's Motion for Summary Judgment [Docket No. 15].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment [Docket No. 12] be DENIED and defendant's Motion for Summary Judgment [Docket No. 15] be GRANTED.

## I.    PROCEDURAL BACKGROUND

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. and for Supplemental Security Income on April 20, 2001.  (Tr. 32).  The Social Security Administration ("SSA") denied plaintiff's application initially and upon reconsideration.  (Id.).  Plaintiff then filed a request for a hearing, and a hearing was held before Administrative Law Judge ("ALJ") Mary M. Kunz.  (Id.).  On December 27, 2002, ALJ Kunz determined that Nelson was not

disabled because she could perform her past relevant work, as well as other jobs that existed in significant numbers in the national economy.  (Tr. 39-40).  Plaintiff did not take any further action to pursue her application.

On or about February 10, 2003, plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income.  (Tr. 83-85, 326-28).  Plaintiff alleges a disability, starting June 18, 2001, due to depression, fibromyalgia,[1] degenerative disc disease of the neck and lower back, headaches, osteoarthritis of the wrist and hand and feet.  (Tr. 105).

The SSA denied plaintiff's application initially and upon reconsideration.  (Tr. 48-50, 57-61, 329, 51-53, 64-66, 330-33).  Plaintiff then filed a request for a hearing and on June 10, 2004, a hearing was held before ALJ Larry Meuwissen.  (Tr. 67, 340-67).  On November 17, 2004, the ALJ issued a decision to deny plaintiff benefits.  (Tr. 26-27).  Plaintiff requested review from the Appeals Council.  (Tr. 12).  On April 30, 2004, the Appeals Council denied her request for review.  (Tr. 8-10).  Denial of review by the Appeals Council made the ALJ's decision the final decision of the Commissioner in this case. (Tr. 8). See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for Summary Judgment [Docket No. 15].

---

[1]    Fibromyalgia:  "a chronic disorder characterized by widespread musculoskeletal pain, fatigue, and multiple tender points.  'Tender points' refers to tenderness that

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).  The impairment must last for a continuous period of at least 12 months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity,

_____

occurs in precise, localized areas, particularly in the neck, spine, shoulders, and hips."

past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920;

see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process in

Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994):

> The first step asks if the claimant is currently engaged in substantial
> gainful employment.  If so, the claimant is not disabled.  If not, the second
> step inquires if the claimant has an impairment or combination of
> impairments that significantly limits the ability to do basic work activities.  If
> not, the claimant is not disabled.  If so, the third step is whether the
> impairments meet or equal a listed impairment; if they do, the claimant is
> disabled.  The fourth step asks if the claimant's impairments prevent [him]
> from doing past relevant work.  If the claimant can perform past relevant
> work, [he] is not disabled.  The fifth step involves the question of whether
> the claimant's impairments prevent [him] from doing other work.  If so, the
> claimant is disabled.

**B.    Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request

review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-

404.982, 416.1467-416.1492.  The decision of the Appeals Council (or of the ALJ, if the

request for review is denied) is final and binding upon the claimant unless the matter is

appealed to Federal District Court within 60 days after notice of the Appeals Council's

action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.    Judicial Review**

Judicial review of the administrative decision generally proceeds by considering

the decision of the ALJ at each of the five steps.  The Court is required to review the

administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

---

Miller-Keane Medical Dictionary (2000).

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989 (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same

record does not prevent a particular finding from being supported by substantial evidence.   Culbertson, 30 F.3d at 939.   The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).   Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.   See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.   Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.   The ALJ's Findings of Fact

Plaintiff has vocationally relevant work experience during the past 15 years as a game attendant, assembler, customer service clerk, advertising sales, receptionist, and insurance clerk.  (Tr. 26, 152, 370-73).  Plaintiff alleged a disability due to depression, fibromylagia, degenerative disc disease of the neck and lower back, headaches, and osteoarthritis of the wrist, hand, and feet.  (Tr. 17).

The ALJ concluded that plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223, and was not eligible for Supplemental Security Income under sections 1602 and 1614(a)(3)(A) of the Social Security Act. (Tr. 27). The ALJ stated that he made the following findings based on the entire record:

1.    The claimant met the disability insured status requirements of the Act through March 31, 2004.

2.    The claimant has not engaged in substantial gainful activity at any time relevant.

3.    The claimant is severely impaired by history of degenerative disc disease of the cervical and lumbar spine, fibromylagia, obesity, and early degenerative arthritis of the hands and a major depressive disorder and features of a dependent personality disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or is medically equal to an impairment found in the Listing of Impairments at 20 C.F.R. Subpart P Appendix 1.

5.    The claimant's testimony regarding her inability to perform work activity is generally not credible.

6.    The undersigned finds that the claimant retains the residual functional capacity for routine repetitive 3 and 4 step light exertional work tasks with brief and superficial contact with others, limited to occasional ramps and stairs and occasional balancing, stooping, crouching, crawling, fingering and fine manipulation and frequent gross manipulation, handling and reaching in all directions including overhead reaching, but avoiding exposure to vibrating tools. Light work is defined as work lifting 20 pounds occasionally and frequently lifting or carrying of objects weighing 10 pounds, standing and/or walking 6 of 8 hours, or sitting most of the time with some pushing and pulling arm or leg controls. 20 C.F.R. § 404.1567.

7.    The claimant is able to perform her past relevant work as a receptionist and as an insurance clerk as it is customarily performed in the national economy.

8.     The claimant was not under a disability as defined in the Social Security Act at any time on or before the date of this decision.  20 C.F.R. §§ 404.1520(f), 416.920(f).

(Tr. 26-27).

## B.     The ALJ's Application of the Five-Step Process

In reaching his findings, the ALJ made the following determinations under the five-step procedure.  (Tr. 17-27).  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  (Tr. 18).

At the second step, the ALJ found that plaintiff was subject to severe impairments from a history of degenerative disc disease of the cervical and lumbar spine, fibromyalgia, obesity, early degenerative arthritis of the hands, and major depressive disorder and features of a dependent personality disorder.  (Tr. 18, 19, 21).  The ALJ also found that plaintiff's left temporal headaches, hypertension, two episodes of chest pain, pes planus, multiple allergies, gastritis, and benign positional vertigo were non-severe impairments.  (Tr. 19-20).  At the third step, the ALJ determined that plaintiff's impairments or combination of impairments do not meet or equal the relevant criteria of any listed impairment.  (Tr. 21).  At the fourth step, the ALJ found that plaintiff is able to perform her past relevant work as a receptionist and as an insurance clerk.  (Tr. 26).

## IV.   ISSUES UNDER REVIEW

On appeal, plaintiff contends the ALJ erred by: 1) failing to grant proper weight to the residual functional capacity opinion of plaintiff's treating physician; 2) failing to offer the vocational expert  a valid and complete hypothetical; and 3) failing to resolve the inconsistencies the VE's testimony and the Dictionary of Occupational Titles.  In her

motion for summary judgment, plaintiff asked this Court to remand the matter back to the Commissioner for a proper residual functional capacity determination and a proper hypothetical question to the VE.  In her cross-motion for summary judgment, the Commissioner asked this Court to deny plaintiff's motion for summary judgment and affirm the decision of the Commissioner denying plaintiff's claims for disability benefits.

## A.    The Medical Evidence Presented to the ALJ for His Consideration

The social security regulations provide that "a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995). "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citing Prosch, 201 F.3d at 1013).

If the ALJ is confronted with conflicting opinions of various physicians, it is the duty of the ALJ to resolve those conflicts.  See Pearsall v. Massanari, 274 F. 3d 1211, 1219 (8th Cir. 2001).  Consequently, an administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.  Id. (citations omitted).  "Even if we would have weighed the evidence differently, we must affirm the

denial of benefits if there is enough evidence to support the other side."  Id. at 1217. (citation omitted).

Although the ALJ bears the primary responsibility for determining a claimant's RFC (see 20 C.F.R. §§ 404.1527(e) and 4167.927(e);  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)), the RFC is a medical question.  See Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  As such, some medical evidence must support the RFC determination by the ALJ, and if necessary, the ALJ should obtain medical evidence addressing the claimant's ability to function in the workplace.  See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Moreover, an ALJ is not required to rely specifically on a physician's assessment of a claimant's RFC, but rather can determine the RFC "based on all the evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier, 294 F.3d at 1024 (quoting MacKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see also 20 C.F.R. §§ 404.1527(e) and 416.927(e).

Plaintiff argued that the ALJ failed to grant proper weight to the residual functional capacity opinion of her treating source, Susan Gillespie, M.S.L.P.  Pl.'s Mem., at 7.  In this regard, plaintiff contended that the opinion of Gillespie—that plaintiff is not able to deal with work stresses and maintain attention and concentration—is entitled to controlling weight.   Pl.'s Mem., at 7-8 (referencing (Mental) Functional Capacity Questionnaire form).  Plaintiff argued that the ALJ substituted his opinion for that of plaintiff's treating source.  Id. at 8.  In support of her position, plaintiff asserted that Gillespie meets the criteria for controlling weight, Gillespie observed and treated plaintiff

over an extended period of time, and Gillespie's opinion is not inconsistent with other substantial evidence in the record.  Id.  Further, plaintiff argued that the ALJ did not identify any examining source whose opinion regarding plaintiff's ability to deal with work stresses and maintain attention and concentration differs from the opinion of Gillespie.  Id.  Plaintiff also maintained that even if the ALJ felt that Gillespie's opinion was not supported by medically acceptable clinical or laboratory diagnostic techniques, or that Gillespie's opinion was ambiguous or deficient in anyway, it was incumbent upon the ALJ to attempt to contact Gillespie to resolve any alleged inconsistencies.  Id.

In response, defendant argued that Gillespie's opinion on work stresses and ability to maintain attention and concentration, reflected by two "marks" on the (Mental) Functional Capacity form, has little, if any, support in medically acceptable clinical and laboratory techniques.  Def.'s Mem., at 17.  In addition, defendant asserted that Dr. Frederiksen, the state agency reviewing psychologist, explicitly explained why Gillespie's opinions regarding stress and ability to concentrate lacked support in Gillespie's notes.  Id. at 13, 17, 21.  Defendant also argued that the ALJ did not replace his own expertise for that of plaintiff's treating source, but instead the ALJ relied on the opinion on Dr. Frederiksen, an expert, who reviewed the record shortly after Gillespie submitted the mental capacities assessment in question, and Dr. Frederiksen specifically explained the basis for concluding that Gillespie's assessment lacked support.  Id. at 19.  In addition, defendant argued that Dr. Frederiksen's review of the record was consistent with Gillespie's treatment notes that preceded the capacities assessment and the notes after the assessment, and plaintiff has not challenged Dr. Frederiksen's analysis in any way.  Id.

In response to plaintiff's argument that the ALJ should have contacted Gillespie if he believed that her opinions were not well supported by the record, defendant argued the ALJ is charged with resolved contradictions in the record.  Id.

In order to determine whether the ALJ's determinations with respect to plaintiff's RFC were supported by the record as a whole, it is necessary to review not only the opinions of Gillespie and Dr. Frederiksen, but to examine the entire record upon which the ALJ relied for his determination regarding plaintiff's mental capacity and ability to concentrate and tolerate stress.[2]

### 1.    Medical Records

On January 17, 2002, Kathleen DelGreco, a Licensed Independent Clinical Social Worker, saw plaintiff for a diagnostic assessment on a self-referral.  (Tr. 232).  Plaintiff reported that for a number of months she had episodes of feeling very good versus feeling bad during the day.  (Tr. 232).  Plaintiff related that two years ago she had been in an automobile accident, from which she suffered a back injury and has a lot of pain.  (Tr. 232).  Plaintiff also stated that she was unsure whether she ever got over her 1998 divorce.  (Tr. 232).  She reported feeling afraid to love, lonely, and stressed, and that a relationship with a man that she had been dating for a number of years ended one week before Christmas.  (Tr. 232).  Plaintiff reported either insomnia or intermittent awakening through the night, fatigue, low energy, appetite loss, tension headaches, nausea, diarrhea and stomach distress, shortness of breath, infrequent

---

[2]    As plaintiff is not contending that the ALJ failed to properly analyze the extent of her claims that she suffers from fibromyalgia, degenerative disc disease of the neck and lower back, headaches, osteoarthritis of the wrist and hand and feet, this Court will not summarize those medical records, except to the extent that they may bear on the three issues raised by plaintiff in her motion.

nightmares and frightening dreams, depression, loneliness, crying spells, mood swings, feelings of helplessness and hopelessness, lack of interest in most activities, low self esteem, and irritable.  (Tr. 232).  Plaintiff also reported that she withdraws and isolates herself, she lacks assertiveness, and she is a perfectionist.  (Tr. 232).  On a daily basis, she has problems with her memory, difficulty concentrating, preoccupation and recurring thoughts.  (Tr. 232).

Plaintiff stated that her symptoms interfere with her personal and social life because she cannot remember how to do things, everything she does takes longer, and she has an inability to perform daily tasks and responsibilities.  (Tr. 232).

Plaintiff reported that her current physical problems include depression, and a head, neck, and back injury.  (Tr. 233).  She also stated that she suffers from repetitive stress syndrome in her hands.  (Tr. 233).  Plaintiff stated that due to her injuries she is not capable of working.  (Tr. 233).  Plaintiff reported that she was diagnosed in 1997 with Adjustment Disorder Depressed and she did improve through the course of therapy.  (Tr. 233).

DelGreco found plaintiff to be of average height and weight.  She was casually, but appropriately dressed with adequate grooming.  (Tr. 233).  Her posture and gait were unremarkable.  (Tr. 233).  Plaintiff made good eye contact, although she often became tearful.  (Tr. 233).  Her mood appeared depressed and her affect flat.  (Tr. 233-31).  She was very cooperative.  (Tr. 231).  Her speech and stream of thought was relevant.  (Tr. 231).  She has chronic pain.  (Tr. 231).  Plaintiff was oriented to person, place, and time, her remote and recent past memory were good, as was her grasp of general information.  (Tr. 231).  DelGreco estimated plaintiff's level of intellectual

functioning to be average.  (Tr. 231).  DelGreco also noted that plaintiff was very verbal and articulate and appeared motivated to deal with her symptoms of depression.

DelGreco made the following DSM-IV multiaxial diagnosis:

| Axis I | 296.33 Major Depressive Disorder, Severe, Recurrent |
|---|---|
| Axis II | Features of Dependent Personality Disorder |
| Axis III | Chronic back pain from auto accident |
| Axis IV | Psychosocial stressors include lack of primary support system, financial concerns, parenting concerns |
| Axis V | GAF = 50 (current)[3] |

(Tr. 231).

DelGreco referred plaintiff for a psychiatric consultation, but did not recommend psychological testing because plaintiff's symptoms appeared applicable to her current situation.  (Tr. 231).  DelGreco stated that plaintiff would be attending individual therapy, bi-weekly, for approximately three to six months.  (Tr. 231).

On January 31, 2002, plaintiff attended a therapy session with DelGreco.  (Tr. 230).  DelGreco informed plaintiff that she would benefit from medication, but plaintiff was resistant because she was on many medications and was allergic to many of them. (Tr. 230).  Plaintiff informed DelGreco that she was not drinking or smoking.  (Tr. 230). Plaintiff stated that she believes she is depressed because she never got over her

---

[3]     The GAF scale is used to assess an individual's overall level of functioning. Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).  The lower the score, the more serious the individual's symptoms.  See id.  GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

divorce and now her ex-husband is calling because she believes he wants custody of the two boys. (Tr. 230). Plaintiff talked about another relationship that ended recently. Plaintiff also discussed the fact that she had to move and her finances. (Tr. 230). DelGreco discussed with plaintiff eating balanced meals, exercising, and socializing. (Tr. 230-230A). DelGreco noted that plaintiff cried during the session and appeared very depressed. (Tr. 230A). DelGreco stated that plaintiff would benefit from medication, but that she was unwilling to take it at that time. (Tr. 230A).

On March 12, 2002, plaintiff attended a medication management session with Dr. Joseph Sivak. (Tr. 229). Dr. Sivak noted that plaintiff presented with an odd affect, depressed, sad, low self-esteem, crying, and gaining weight. (Tr. 229). Plaintiff stated that she broke up with her boyfriend because her 14-year-old son did not like him and now the son lives with his father. (Tr. 229). Plaintiff lives off the social security benefits she receives for her 10-year-old son and child support. (Tr. 229). Her youngest son suffers from Oppositional Defiant Disorder (ODD) and ADHD. (Tr. 229). Plaintiff reported drinking once a week, being in ten automobile accidents over the years, and wearing a medicine bag because she believes it helps her. (Tr. 229). She reported pain and pain in her head, which are nerve pains that radiate all over her body. (Tr. 229). Plaintiff reported premonitions and appeared to believe she has some clairvoyance. (Tr. 229). Dr. Sivak stated that plaintiff feels hopeless, helpless, low energy, and anhedonia. (Tr. 229). Dr. Sivak prescribed Celexa, and noted that plaintiff has some unusual beliefs and is somatically fixated, which may be a sign of depression bordering on quasi-delusional material. (Tr. 229A).

On March 15, 2002, plaintiff attended a therapy session with DelGreco.  (Tr. 228).  Plaintiff reported that she was seeing a chiropractor and it was helping with her physical issues.  (Tr. 228).  Plaintiff talked about seeing an ex-boyfriend.  (Tr. 228).  DelGreco discussed problem solving and decision-making skills.  (Tr. 228).  DelGreco noted that plaintiff's mood appeared somewhat elevated and that she made good eye contact.  (Tr. 228).  DelGreco also noted that plaintiff appeared to be able to focus on an issue or decision and did well with the decision-making criteria.  (Tr. 228).

On July 9, 2002, plaintiff attended a therapy session with Susan Gillespie, M.S.L.P.  (Tr. 227).  She is diagnosed with major depression and dependent personality disorder features.  (Tr. 227).  Plaintiff discussed confrontations with a male friend, a female friend, and her son.  (Tr. 227).  Plaintiff indicated that she was stressed out about the relationship issues.  (Tr. 227A).

On October 17, 2002, plaintiff attended a one-hour therapy session with Gillespie.  (Tr. 225).  She was diagnosed with major depression with dependent personality features.  (Tr. 225).  Plaintiff talked about her Social Security hearing and her family issues.  (Tr. 225).  Gillespie noted that plaintiff seemed to be in more pain and used a cane.  (Tr. 225).  Gillespie also noted that plaintiff was experiencing more depression and stress during this session.  (Tr. 225A).

On October 23, 2002, plaintiff attended a medication management meeting with Dr. LaKosky.  (Tr. 224-224A).  It was noted that plaintiff was inconsistent in her reports about how her depression is doing.  (Tr. 224).  Plaintiff reported sleeping more.  (Tr. 224).  Dr. LaKosy indicated that plaintiff had no signs of psychosis, she made good eye

contact, was well groomed, and had no appearance of auditory or visual hallucinations and made no suicidal or homicidal statements. (Tr. 224).

On November 13, 2002, plaintiff was referred to physical therapy for evaluation and treatment. (Tr. 180). Plaintiff was asked to check on a form anything in which she suffered a decline in her usual ability to perform that was not currently being addressed by her doctor or other health care professional. Among those items that plaintiff indicated experiencing a decline, plaintiff noted a decline in her ability to remember things or reasons in order to perform basic self-care activities. (Tr. 181). On the same form, plaintiff also indicated that she did not currently use tobacco products and that she was not addicted to other drugs. (Tr. 181). The therapist noted that the goal of physical therapy was to decrease plaintiff's discomfort, increase her activity level, and instruct her in posture, body mechanics, and a home exercise program. (Tr. 182). Plaintiff's stated goal was to be able to perform more housework. (Tr. 182). The therapist reported that when plaintiff began physical therapy, her discomfort level was an eight, however, throughout treatment (November 13, 2002 through November 20, 2002), the discomfort level fell to a six and plaintiff felt she was walking better. (Tr. 182). As for her pain level, plaintiff stated that it was at nine of ten when she started and fell to seven out of ten by the end of the therapy. (Tr. 182). The physical therapist noted that she seemed very happy. (Tr. 182).

On January 6, 2003, plaintiff was seen by Dr. Moore for a rheumatology consultation. (Tr. 172). Plaintiff's chief complaint was pain. (Tr. 172). In this consultation, plaintiff reported having trouble doing usual activities around her home. (Tr. 173). For example, she stated that she did not carry a laundry basket downstairs,

but she did try to do the dishes every morning.  (Tr. 173).  She also reported smoking two to three cigarettes per day, having one drink per week, gaining 35 pounds in the last six months, and that she is chronically tired, has headaches, dizziness, memory loss, ringing in her ears, eye pain, nose dryness, sleeping problems, night sweats, nausea, alternating diarrhea and constipation, heartburn, swollen and tender glands, some bruising, and her toes get white with cold exposure.  (Tr. 173).  Plaintiff told Dr. Moore that she had been treated for depression and anxiety.  (Tr. 173).

Upon examination, Dr. Moore noted that plaintiff was cooperative, but had a somewhat flat effect and poor color.  (Tr. 173).  Dr. Moore's impression was that plaintiff suffered from degenerative disk disease/arthritis of the lumbar and cervical spine.  (Tr. 174).  She also suffered from early degenerative arthritis of her hands.  (Tr. 174).  She has 14 positive fibromyalgia trigger points.   (Tr. 174).   She also suffered from deconditioning, exogenous obesity, and structural problems with her feet, pes planus, and lateral weight bearing.  (Tr. 174).  Dr. Moore discussed plaintiff's problems with her, including the importance of losing weight and increasing strength.  (Tr. 174).  He referred her to physical therapy for an extensive program, and told her she needs orthotics.  (Tr. 174-75).

On January 20, 2003, plaintiff attended a therapy session with Gillespie.  (Tr. 223-223A).  Plaintiff talked about the cold weather and how it impacted her pain and ability to move around.  (Tr. 223).  She also talked about her alcoholic sister who had stayed with her during the holidays and parenting issues.  (Tr. 223).

On January 22, 2003, plaintiff treated with Dr. McDowell for a follow up to earlier treatment.  (Tr. 244).  During this visit, plaintiff stated that she suffered from occipital

headaches and was having stress at home with her children because she was trying to home school them.  (Tr. 244).  Plaintiff stated that she would try to get them back into school so they could work with trained teachers and have access to special education.  (Tr. 244).  She also asked Dr. McDowell what kind of jobs she could do.  (Tr. 244).  Dr. McDowell asked what she would do about home schooling her children if she got a job tomorrow.  (Tr. 244).  Plaintiff replied that she had not even thought about it and said she would try to get them back into school.  (Tr. 244).

Dr. McDowell indicated that plaintiff's hypertension was new, that she suffered from occipital headaches secondary to stress headache or high blood pressure, and chronic low back pain.  (Tr. 244).  Dr. McDowell recommended that plaintiff attend all her physical therapy sessions, and counseled plaintiff to talk to Social Services about jobs she could perform and to get her children back in school.  (Tr. 244).

On January 27, 2003, Dr. Moore sent a letter to plaintiff regarding what type of job she could perform.  (Tr. 171).  He stated that this was a difficult question to answer because it depended on her education, but indicated from past experiences with plaintiff that she could not do a job that requires repetitive type activities.  (Tr. 171).  Dr. Moore also placed on plaintiff a five-pound weight restriction that she could lift occasionally.  (Tr. 171).  He also noted that a job where plaintiff had to stand for long periods of time would be difficult. (Tr. 171).   Dr. Moore suggested that plaintiff could perform a reception duty job.  (Tr. 171).  Dr. Moore suggested plaintiff seek advice from the vocational rehabilitation center.  (Tr. 171).

On February 4, 2003, plaintiff treated with Gillespie.  (Tr. 222).  Plaintiff talked about the rejection of her disability claim, the various accidents in which she had been

involved, and a possible head injury from one of the accidents, which she stated affected her memory.  (Tr. 222).  Plaintiff also commented that she planned to go visit the Division of Rehabilitation Services to find out if there were jobs that she would be able to handle based on her physical problems and diagnoses from her doctors.  (Tr. 222).  Plaintiff rated her depression as a 5 on a scale from 1-10.  (Tr. 222A).  Plaintiff also surmised that if she did not have physical problems and chronic pain, she would not have depression.  (Tr. 222A).  Gillespie reported that plaintiff continued to experience some stress with her children.  (Tr. 221).

On February 14, 2003, plaintiff returned to Dr. Moore for a follow-up visit.  (Tr. 169).  She questioned Dr. Moore about what kind of work she could perform.  (Tr. 169).  She stated that she feels some memory loss and wondered if it was related to remote trauma in 1999.  (Tr. 169).  She also stated that she still has pain in multiple areas.  (Tr. 169).  Plaintiff indicated that she has attended physical therapy, she was doing stretching exercises as well as aerobic exercises, she was using a bike and treadmill, and she planned to use a "gazelle" machine at home.  (Tr. 169).  She indicated that she was short of breath and wondered how that related to her smoking.  (Tr. 169).

On February 19, 2003, plaintiff attended a therapy  session with Gillespie.  (Tr. 220).  Plaintiff stated that she was doing better in some areas of her life.  She talked about her relationship with a male friend and her children and the stress they added to her life. (Tr. 220-220A).  Gillespie noted that plaintiff reported that she was doing a little better physically due to rehabilitation.  (Tr. 220A).  Gillespie also noted that plaintiff "looked and sounded probably the best I have seen her in terms of her physical appearance and her affect, and I do think the rehab helping her deal with her

fibromyalgia and physical problems has helped with some of the depression." (Tr. 220A).

On March 10, 2003, plaintiff attended a therapy session with Gillespie. (Tr. 219). Plaintiff stated that medication has definitely helped her cope better with her depression and she felt better. (Tr. 219). She also stated that physical therapy had helped her and she wanted to continue with physical activity because she felt more limber and it helped her with stress. (Tr. 219). Plaintiff reported that she was walking without her cane because she was trying to build muscle strength and she was walking short distances without the cane. (Tr. 219). Plaintiff also talked about her children and her relationship with a male friend. (Tr. 219). Gillespie noted that plaintiff has "definitely made progress from when she first saw Kay DelGreco and actually has improved these last few times that I've seen her partly because of what's been happening with her physical therapy. This is definitely increased her physical well being as well as her emotional mental well being." (Tr. 219A).

On March 25, 2003, plaintiff attended a therapy session with Gillespie. (Tr. 218). Plaintiff stated that she was feeling better because one of her sons had gone back to school. (Tr. 218). She also stated that physical therapy was helpful and she was trying to perform the stretching and exercises on a regular basis. (Tr. 218). She also talked about her relationship with a male friend. In her notes, Gillespie stated that plaintiff was feeling much better and that her depression was more under control. (Tr. 218). Gillespie also noted that plaintiff still struggled with chronic pain and fibromyalgia. (Tr. 218A).

On March 26, 2003, Nancy Swedlund, a Licensed Psychologist, issued a report on a Minnesota Multiphasic Personality Inventory-2 ("MMPI-2")[4] performed on plaintiff on March 7, 2003, as a referral from Gillespie.  (Tr. 234).  The Validity Scales indicated that the test was a valid profile that was likely to accurately represent plaintiff's psychological functioning.  (Tr. 234).  The MMPI-2 results indicated that plaintiff was experiencing considerable psychological distress and had a tendency to develop physical symptoms in response to the distress.  (Tr. 236).  She was also feeling depressed.  (Tr. 236).  The test also indicated that plaintiff likely has a tendency to overreact to minor physical symptoms.  (Tr. 236).  She also may be experiencing some unusual thoughts and bodily sensations and may be having problems with attention and concentration.  (Tr. 236).  The results further indicated that plaintiff likely was passive-aggressive in relationships and felt misunderstood and mistreated.  (Tr. 236).  She also tended to be dependent and rely on others to meet her needs.   (Tr. 236).  Dr. Swedlund noted that individuals with this pattern of scores often lacked insight and preferred physical rather than psychological explanations for their problems, and their personality problems tended to be long lasting.   (Tr. 236).   Dr. Swedlund's diagnostic considerations included depressive disorder and personality disorder with dependent and passive-aggressive features.  (Tr. 236).

On April 16, 2003, Dr. Mario J. Zarama, state consulting physician, performed a Residual Functional Capacity Assessment on plaintiff.  (Tr. 189).  Dr. Zarama indicated that plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds,

---

[4]      "The MMPI-2 consists of ten clinical scales as well as three validity scales, designed to measure various aspects of the individual's personality as well as test-taking attitude and test validity."  (Tr. 234).

frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and push and/or pull (including operation of hand and/or foot controls an unlimited amount of time, other than shown for lift and/or carry. (Tr. 190). Dr. Zarama also indicated that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 191). Dr. Zarama indicated that plaintiff could frequently perform overhead reaching, non-overhead reaching, handling, and feeling with her right and left hands, but could only occasionally perform fingering with her right and left hands. (Tr. 192). Dr. Zarama indicated that plaintiff had unlimited restrictions on environmental limitations of extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards, but she was to avoid all exposure to vibrations. (Tr. 193). Dr. Zamara then indicated that plaintiff symptoms are attributable to a medically determinable impairment and that the severity of the symptoms and the alleged effect on function was consistent with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits. (Tr. 194). Finally, Dr. Zamara stated that there were no treating or examining source statements regarding the plaintiff's physical capacities in the file. (Tr. 195).

On April 17, 2003, Dr. Dan Larson, state consulting physician, performed a RFC Assessment on plaintiff's affective disorders. (Tr. 197). Under "12.04 Affective Disorders" Dr. Larson indicated that plaintiff suffered from depression, and rated plaintiff's functional limitations on the 12.04 listings as follows: (1) mild restrictions on activities of daily living; (2) moderate difficulties in maintaining social functioning; (3)

moderate difficulties in maintaining concentration, persistence, or pace, and (4) no episodes of decompensation. (Tr. 200, 207).

On the same day, Dr. Larson performed a Mental Functional Capacity Assessment on plaintiff. (Tr. 211). As to understanding and memory, Dr. Larson indicated that plaintiff was not significantly limited in her ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions. (Tr. 211). However, Dr. Larson indicated that plaintiff was moderately limited in her ability to understand and remember detailed instructions. (Tr. 211).

As to sustained concentration and persistence, Dr. Larson indicated that plaintiff was not significantly limited in her ability to carry out very short and simple instruction, in her ability to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances, in her ability to sustain an ordinary routine without special supervision, in her ability to make simple work-related decisions, and in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 211-12). However, Dr. Larson indicated that plaintiff was moderately limited in her ability to carry out detailed instructions, in her ability to maintain attention and concentration for extended periods, and in her ability to work in coordination with or proximity to others without being distracted by them. (Tr. 211).

As to social interaction, Dr. Larson indicated that plaintiff was not significantly limited in her ability to ask simple questions or request assistance, in her ability to

accept instructions and respond appropriately to criticism from supervisors, in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. 212).  However, Dr. Larson indicated that plaintiff was moderately limited in her ability to interact appropriately with the general public.  (Tr. 212).

As to adaptation, Dr. Larson indicated that plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting, in her ability to be aware of normal hazards and take appropriate precautions, in her ability to travel in unfamiliar places or use public transportation, and in her ability to set realistic goals or make plans independently of others.  (Tr. 212).

In his report, Dr. Larson reported that clinical data supported a diagnosis of depression.  (Tr. 215).  However, he noted that plaintiff was able to live with her sons and provide care for them.  (Tr. 215).  She also reported that she was able to perform household chores such as cooking, cleaning, and shopping, and that she was able to drive and to handle money.  (Tr. 215).  Plaintiff did not socialize a lot, but she was pleasant.  (Tr. 215).  Dr. Larson found plaintiff's concentration and stress tolerances reduced, but her overall level of function was sufficient for basic chores.  (Tr. 215).  Further, Dr. Larson found that plaintiff had not deteriorated in a work or work-like setting.  (Tr. 215).

Based on this assessment, Dr. Larson made the following findings:

- Plaintiff retains the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with both detailed and complex instructions.

- Plaintiff's ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks.

- Plaintiff's ability to interact and get along with co-workers would be moderately impaired, but adequate for brief, infrequent, and superficial contact.

- Plaintiff's ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.

- Plaintiff's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.

- Plaintiff's ability to accept supervision would be moderately impaired, but adequate to cope with ordinary levels of supervision found in a customary work setting.

- Plaintiff's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.

(Tr. 215).

On April 22, 2003, plaintiff attended a therapy session with Gillespie in which she discussed a relationship with a man and issues she had with parenting.  (Tr. 217). Plaintiff also stated that as far as her pain, some days were better than others, and she had trying to exercise, which was helpful.  (Tr. 217A).

On May 7, 2003, plaintiff treated with Gillespie.  (Tr. 290).  Plaintiff stated that she was home schooling both boys again.  (Tr. 290).  Plaintiff discussed her relationship with a man.  (Tr. 290).  Plaintiff also stated that she was getting back into crafts and that they were a good escape from her problems.  (Tr. 291).  Gillespie noted that plaintiff's depression seemed somewhat improved, but she continued to be under a lot of stress with her children, and struggled with her physical health.  (Tr. 291).

On June 17, 2003, plaintiff treated with Gillespie.  Plaintiff discussed how she was physically and emotionally tired and stressed from being involved in trying to find a missing child.  (Tr. 288).  Plaintiff also talked about activities she had done with her daughter and two sons, and that she was now attending her own AA meetings without her significant other.  (Tr. 288-89).  Plaintiff reported feeling better and doing better, except for the recent stress from the missing child.  (Tr. 289).

On June 24, 2003, Gillespie filled out a (Mental) Functional Capacity Assessment Questionnaire.  (Tr. 261-63).  The form asked her to check the boxes that best described plaintiff's ability to adjust to a job and then asked her to do the following:

> Identify the particular medical or clinical findings (i.e. mental status, examination, behavior, intelligence, test results, symptoms) which support your assessment of any limitations.  It is important that you relate particular medical findings to any assess reduction in capacity.  The usefulness of your assessment depends on the extent to which  you do this.

(Tr. 261).

On the form, under the heading "Making Occupational Adjustment," Gillespie checked that plaintiff had a good ability to relate to co-workers and deal with the public.  (Tr. 261).  Gillespie checked that plaintiff had a fair ability to follow work rules, use judgment, interact with supervisors, and function independently.  (Tr. 261).  Gillespie checked "poor/none" with respect to ability to deal with work stresses and maintain attention/concentration.  (Tr. 261).

Under the heading "Making Performance Adjustments," Gillespie checked that plaintiff had a fair ability to understand, remember and carry out detailed, but not complex  instructions,  and  to  understand,  remember  and  carry  out  simple  job

instructions.   (Tr. 262).   Gillespie checked "poor/none" for ability to understand, remember and carry out complex job instructions.  (Tr. 262).

Under the heading "Making Personal/Social Adjustments," Gillespie checked that plaintiff had a good ability to maintain personal appearance, but a fair ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  (Tr. 262).  Gillespie indicated that plaintiff was capable of managing benefits in her best interest.  (Tr. 263).

When asked to describe any limitations, including the medical or clinical findings that supported her assessment, Gillespie wrote: "depression, personality disorder, major depression recurrent, and a personality disorder NOS."  (Tr. 261-62).

On July 23, 2003, Dr. Sharon Frederiksen, the state agency reviewing psychologist, filled out a Psychiatric Review Technique form that indicated that a RFC assessment of plaintiff was necessary based on plaintiff's affective and personality disorders.  (Tr. 264).   Under affective disorders, Dr. Frederiksen noted that plaintiff suffered from a mood disturbance accompanied by decreased energy and feelings of guilt or worthlessness, but those feelings were improving.  (Tr. 267).  Dr. Frederiksen also indicated that plaintiff suffered from depression, for which she was on medication and seeing a therapist, which is a medically determinable impairment.  (Tr. 267).

Under personality disorders, Dr. Frederiksen indicated that plaintiff suffers from personality disorder, NOS, based on her relationship issues, dependent features, and parenting issues.  (Tr. 271).

Under substance addition disorders, Dr. Frederiksen noted that plaintiff had been sober since February 2003 and that she had drank to relieve pain.  Dr. Frederiksen also

noted that since February 2003, plaintiff had attended AA at least twice a week.  (Tr. 272).

Under functional limitations, Dr. Frederiksen checked that plaintiff had mild restrictions on her activities of daily living, mild to moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 274).

On the same day, July 23, 2003, Dr. Frederiksen filled out a Mental Functional Capacity Assessment on plaintiff.  (Tr. 279-82).   In the summary accompanying the Assessment, (Tr. 283;  see also  Tr. 276-76), Dr. Frederiksen noted that records from Range Mental Health Center (RMHC)[5] indicated that plaintiff was improving and feels somewhat less depressed from February 2003 through the present.  (Tr. 276, 283). According to Dr. Fredriksen, these records indicated that plaintiff's therapy had focused on parenting and relationship issues.  (Tr. 283).  Dr. Frederiksen stated that the therapy notes from February 2003 through the present did not indicate overt signs of depression, but they did indicate that plaintiff was frustrated with her sons who misbehave, that she was able to set and keep goals in therapy, and that she reads books on issues such as AA and relationships.  (Tr. 276, 283).

Dr. Frederiksen also indicated that the therapy notes did not address alcohol use or AA, but that a written Activities of Daily Living questionnaire (ADL) prepared by plaintiff dated June 17, 2003, indicated that plaintiff had been sober since February 2003, attends AA twice a week, and attends church at least once a week.  (Tr. 283). The ADL also indicated plaintiff could perform light household tasks as physical

---

[5]      Dr. Gillespie practiced with the Range Mental Health Center.

symptoms allow, has interests in arts and crafts, reads daily, gardens some, drives daily, is able to eat take out and shop, is seeing more of a boyfriend, and that she stays away from crowds to avoid being bumped.   (Tr. 276, 283).   According to Dr. Frederiksen, the ADL did not note problems with concentration or attention, rather plaintiff indicated that her primary limitations were due to physical symptoms which are addressed elsewhere.

As to the (Mental) Functional Capacity Assessment Questionnaire prepared by Gillespie on June 24, 2003, in which Gillespie indicated that plaintiff was unable to work due to poor stress tolerance and poor attention/concentration, Dr. Frederiksen stated that the therapy notes did not support an increase in mental symptoms, but rather indicated some improvement.   In addition, Dr. Frederiksen stated that no overt symptoms of depression or problems with attention or concentration were noted, and the primary limitations in stress tolerance were due to parenting the two sons who misbehave.  (Tr. 277, 283).  Dr. Frederiksen also stated that the clinical records from plaintiff's treatment did not support a finding of poor attention/concentration as she was able to concentrate on goals of her choice.  (Tr. 277).  In this regard, Dr. Frederiksen observed that plaintiff's "goal in therapy is to focus on relationships and herself.  Work is not a goal or focus."  (Tr. 278).  Dr. Frederiksen found no indication of an increase in mental symptoms, no history of decompensation or job loss due to mental symptoms.  (Tr. 283).

Based on her review of plaintiff's medical records and ADL, Dr. Frederiksen concluded:

- Plaintiff retains the capacity to concentrate on, understand, and remember routine, three and four step and limited detailed, instructions. HS grad, average IQ estimate.

- Plaintiff's ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks.

- Plaintiff's ability to interact and get along with co-workers and the public would be mildly to moderately impaired, but adequate for superficial contact; no crowds.

- Plaintiff's ability to sustain an ordinary routine without special supervision is not significantly impaired.

- Plaintiff's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and occasionally four step work setting.

- Plaintiff continues in therapy and some medication management; is sober 2/03 to present and reports some improvement.

(Tr. 283).

On October 8, 2003, plaintiff treated with Gillespie.  (Tr. 286).  Plaintiff reported that she had a successful summer, but when school started she had stress relating to her significant other, her kids, and financial stress due to child support issues with her ex-husband.  (Tr. 286).  Plaintiff discussed her physical problems, disability, and employment.  Gillespie encouraged plaintiff to get a job to see how she could handle it. According to Gillespie, if plaintiff was not able to stay with the a job that would provide more evidence to show that she should be on disability; on the other hand, if plaintiff was successful with a job, that would make her feel better about herself and put herself in better financial shape.  (Tr. 287).

On October 15, 2003, plaintiff treated with Dr. Mitch Cardwell.  Dr. Cardwell noted that plaintiff has a personality disorder and depression that would make

employment difficult for her, but most likely not impossible. (Tr. 293). Dr. Cardwell suggested plaintiff be evaluated by a disability examiner to determine whether she has a disability. (Tr. 293). Dr. Cardwell also stated that plaintiff needed some kind of vocational rehabilitation, because with her mental attitude and physical constraints, it might be difficult for her to find gainful employment. (Tr. 293).

On October 31, 2003, plaintiff treated with Gillespie. Plaintiff discussed her depression and medication, and a future assessment by Dr. Whitaker who is to assess her regarding her physical and mental health problems and her ability to work. (Tr. 284). Plaintiff reported that she experienced more pain in the cold weather and that she was not moving well. (Tr. 284). She also reported that she signed on to be a bell ringer for the Salvation Army, but would perform the duties inside the mall. (Tr. 284). Plaintiff discussed her parenting troubles and reported that she was still home schooling her son and her other son planned to come back home. (Tr. 284-85). Plaintiff then talked about her boyfriend. (Tr. 285). Gillespie indicated that plaintiff reported some improvement with her depressive symptoms, other than difficulties sleeping. (Tr. 285). Gillespie also indicated that plaintiff reported more pain in the colder and damper weather. (Tr. 285). Gillespie noted that plaintiff did not know how she would manage working as well as taking care of her son. (Tr. 285).

## 2.     Plaintiff's Testimony at Trial

On June 10, 2004, plaintiff appeared and testified at the hearing held before the ALJ. (Tr. 340). Plaintiff testified as follows: She has home schooled her youngest son for the past two years. (Tr. 345-46). She has a driver's license and drives. (Tr. 347). She applied to be a reservation clerk at Northwest Airlines, but she was not hired. (Tr.

349).   She applied for vocational training two years ago, but is still waiting for the training.  (Tr. 350).  She suffered from an alcohol substance addiction disorder, but she quit drinking on February 8, 2003 and was attending a 12-step program.  (Tr. 351).  She indicated that she would also like to quit smoking, but she currently does smoke.  (Tr. 351).

Plaintiff does her own shopping—usually at the Salvation Army and the Food Shelf.  (Tr. 352).  She attends church every Sunday and attends AA meetings three to four times a week.  (Tr. 353).  She also sponsors three people in the AA program, talking to one person between one and two hours every day, but less time with the other two.  (Tr. 353).

Plaintiff testified that now that she has stopped drinking she can  tell when her body hurts, which allows her to do something about it—sit down or do meditations— which help her a lot.  (Tr. 354).

Plaintiff stated that she has a cane, but she does not always use it.  She can walk for about a block.  In May 2004, plaintiff saw a doctor for chest pains.  (Tr. 354). She quit going to the mental health clinic because Virginia is a long drive and her AA 12-step program has helped her.  (Tr. 355).  She stopped taking medication for her mental health.  (Tr. 355).

Plaintiff reported that she could stand for approximately 15 minutes, sit pretty long, and now she has orthotics for her shoes, which helps with the standing.  (Tr. 356). She testified that she could not perform the past job she had in the insurance industry because she had to bend her neck in a goofy way while she was looking at the computer screen; she could not perform her past job as a pull tab attendant due to

sitting on a bar stool and the movements required to get the pull tabs that customers ordered; she could not perform her past job in advertising sales for a newspaper because it involved driving around, and knocking on doors; and she could not perform her past job as a customer service representative, even if she did not have to lift heavy boxes and had an ergonomically correct office set up, because after about an hour of sitting her neck started to hurt, which lead to headaches, and sounds in her left ear like singing frogs make.  (Tr. 356-57, 359-61, 389).

As for hobbies, plaintiff testified that she enjoys painting, and recently painted a 16 x 20 portrait of her granddaughter, which took about two months to do.  (Tr. 362-63).

Plaintiff testified that she has arthritis and degenerative disc disease in her neck and back.  (Tr. 363).  She also suffers from a disc protrusion that led to pain in her legs. (Tr. 364).  She has problems with burning sensations in her legs, lumps in her muscles, flat feet, bunions, arthritis in her hands, and chest pains.  (Tr. 364-66).  Plaintiff described herself as suffering from intense and unstable personal relationships, which meant she does not do well in relationships, and they usually end with a breakup.  (Tr. 368).

### 3.    Activities of Daily Living Questionnaires

On March 4, 2003, plaintiff filled out an Activities of Daily Living Questionnaire. (Tr. 119).  Plaintiff stated that she suffered from fibromyalgia and she has been having pain for a long time, and all her muscles ached.  (Tr. 119).  Specifically, she has pain in her arms, hands to shoulders, and in her feet, for which she wears orthotics.  (Tr. 119). Plaintiff stated that she does exercise, but that it was painful for her.  (Tr. 119).  She stated that she was depressed.

Before her impairment, plaintiff stated that she was active—worked, did crafts, cleaned her house, dressed up, went dancing, walked, rode her bike, hunted, camped, fished, knitted, curled her hair, and called and visited friends.  (Tr. 119-20, 123).  Since her impairment began, plaintiff indicated that she no longer did those things because she hurts too much, has a low mood, little motivation, feels tired, and does not want to be bothered by people.  (Tr. 119).  She also stated that she bathes and washes her hair every 3-4 days, and brushes her teeth daily.  (Tr. 119).  She wears stretch pants and clothes that she can pull on because she has trouble with buttons and zippers.  (Tr. 119).

After plaintiff's impairment began, plaintiff stated that a typical day includes getting up to help her son off to school.  (Tr. 120).  Then she goes back to bed until about 10:00 a.m., and then gets up and dressed, depending on whether someone is coming to the house.  (Tr. 120).  She does the dishes in increments, and does her exercises in ten minutes increments.  (Tr. 120).  She works with her son on his home schooling assignments during that time as well.  (Tr. 120).  Her son fixes lunch.  (Tr. 120).  After lunch, plaintiff continues to assist her son with his homework and then watches television.  (Tr. 120).  She reported that she feels stressed out when her oldest son gets home from school.  Sometimes she fixes dinner and then watches television until she goes to bed.  (Tr. 120).

Before plaintiff's impairment began, a typical day included getting up, making breakfast, getting the children to school, cleaning the house, getting showered and dressed, doing her hair, putting on makeup, working from 11:00 a.m. to 3:00 p.m., home, shopping, helping with homework, and then making supper.  (Tr. 120).  Plaintiff

also baked, cleaned the house, said prayers, and then put the kids to bed.  After that, she would read until she went to bed.  (Tr. 120).

Plaintiff stated that her children normally cooked, she did not do any real cleaning, she intermittently did some housework, and her sons vacuumed and scrubbed the floors, did the yard work, carried things for her, and removed the snow.  (Tr. 120).

Plaintiff reported having constant pain and aching, stiffness and pain in her hands, trouble being on her feet, back pain, and less desire, energy, and motivation. (Tr. 120).  She said that she needs many breaks.  (Tr. 120).

Plaintiff stated that she belongs to a friendship prayer circle, consisting of 10 ladies who meet once a month.  (Tr. 121).  She relies on these ladies for support.  (Tr. 121).  She also stated that she tries to stay away from her family.  (Tr. 121).  Plaintiff reported getting emotional and upset around authority figures and is very nervous around them.  (Tr. 121).  Plaintiff reported drinking quite a bit before she was on medication because it seemed to help the pain, and her family used to worry about her. (Tr. 121).

Plaintiff also reported having difficulty with buttons, zippers, tying knots, walking, driving, completing household chores, bending, stooping, and writing.  (Tr. 123).  She also reported poor grip strength, and difficulty concentrating on reading and paying bills. (Tr. 123).  She also reported that she washed dishes slowly.  (Tr. 123).  Plaintiff said it took her six months to complete an oil painting, because she constantly needed rest. (Tr. 123).

When plaintiff was under pressure, she stated that she was crabby, and did not like to be hurried or pressured.  (Tr. 123).  Paper work stressed her out.  (Tr. 123).  She

worries about money, deadlines, teachers calling her about her children, and her ex-husband's health problems.  (Tr. 123).

Plaintiff attempted to do home business crafts, but her condition worsened and she was not able to produce more than one or two items because she was so slow.  (Tr. 124).

On March 9, 2003, Robert Zamlen, plaintiff's friend, filled out an Activities Questionnaire regarding plaintiff.  (Tr. 133-136).  Zamlen stated that plaintiff attempted to look presentable, usually wearing comfortable clothes.  On a typical day, plaintiff got up around 7:00 a.m. to get her kids ready for school, did her exercises, did the dishes, watched television, shopped, took medication, called people to check up on them, was home when the children were done with school, made supper, watched television, and went to bed.  (Tr. 133).

Zamlen reported that plaintiff liked to watch television, tend to her plants, take care of her children, be outside, fish, paint, read, and listen to music.  (Tr. 133).  Zamlen also stated that plaintiff used to go hunting, but she did not do that any more due to lack of mobility.

Zamlen stated that he finds plaintiff to be pleasant, except when she is in pain.  (Tr. 133).  Plaintiff did not have a boyfriend, and felt like she did not have any friends to count on and no family to help her out.  (Tr. 133).  She spends time with her two sons that live with her and her son was worried about her drinking.  (Tr. 135).

Zamlen reported that plaintiff has trouble holding things in her hands, and she did housework in increments.  (Tr. 135).  Zamlen stated that plaintiff did not have the means or energy to pursue hobbies because she must concentrate on daily necessities.  (Tr.

135).  Zamlen also stated that plaintiff's house cleaning skills were suffering and she was absent-minded.  (Tr. 135).  When she was under pressure, Zamlen stated that plaintiff may leave the situation, shut down, lock herself in her room, break down crying, or go somewhere to have a cigarette.  (Tr. 136).

On June 17, 2003, plaintiff completed a second Activities of Daily Living Questionnaire.  (Tr. 141).  Plaintiff noted that she no longer goes to physical therapy because her insurance ran out, but she tries to stretch.  (Tr. 141).  She stated that she was poor at aerobics because it was too painful.  (Tr. 141).  Her right thumb hurts, as well, making it hard for her to write or grip.  (Tr. 141).  She was attending AA and had not consumed alcohol since February 8, 2003.  (Tr. 141).  She also reported feeling cranky and crabby, and having trouble eating as she has no appetite.  (Tr. 141).

Plaintiff stated that she is trying to lose weight as ordered by her doctor, and that her boyfriend reminds her to bathe, comb hair, and change clothes.  (Tr. 141).

Plaintiff reported that in a typical day since her impairment began, she wakes up at about 7:00 a.m., eats breakfast, and plans her day.  (Tr. 142).  She does 10 minutes of stretching.  (Tr. 142).  She eats lunch around noon.  (Tr. 142).  In the afternoon she reads and works in her garden for an hour maximum.  (Tr. 142).  Plaintiff reported that her boyfriend cooks dinner around 6:30 p.m.  (Tr. 142).  She then attends an AA meeting in the evening.  She and her boyfriend will sometimes rent a movie.  (Tr. 142).  She goes to bed by 10:00 p.m.  (Tr. 142).

Plaintiff also reported that her boyfriend pushes her to eat, she tackles tasks in increments, does one load of laundry every week, she gets exhausted from shopping, and drives as needed.  (Tr. 142).

Plaintiff stated that her right thumb is very painful and she has less use of her hands. (Tr. 142). As far as interests go, she stated that she likes reading, working in her garden, and tending to her houseplants. (Tr. 142). Plaintiff then stated that she can only be around positive people and has no tolerance for negative people. (Tr. 142). She indicated that she quit the friendship prayer circle, but she does go to AA meetings and enjoys the support. (Tr. 143). She said she still avoids crowds because she does not want anyone to bump her. (Tr. 143).

Plaintiff also stated that it was difficult for her to be in crowds, to be patient with people, and to be calm. (Tr. 145). She has been reading her AA materials and the Bible. She no longer irons clothes. She cannot remove the clothes from the dryer. (Tr. 145). She needs help doing yard work, household maintenance, cleaning, writing, eating, and bathing. (Tr. 145). She now tries to escape stress by leaving the house. (Tr. 145).

## B.    The RFC Determination

Based on the facts in the record, the Court finds that there is substantial evidence to support the ALJ's assessment of plaintiff's RFC, and in particular his decision to give no weight to Gillespie's statement in June 2003, that plaintiff had "poor/none" ability to deal with work stresses and maintain attention/concentration.

The social security regulations provide that "a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R.

§ 404.1527(d)(2) (concluding that the ALJ was correct in not giving controlling weight to a treating physician's opinion where such opinion was unsupported by clinical signs and inconsistent with the physician's own prior evaluations)).  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citing Prosch, 201 F.3d at 1013).  Regardless, the ALJ is required in every instance to provide "good reasons" for the weight he gives a treating physician's opinion.  Id.; see also Fritz v. Barnhart, No. Civ. 01-1345 (JRT/AJB), 2002 WL 31185867, at *2 (D. Minn. Sept. 30, 2002) ("In every instance, the regulations require the ALJ to give 'good reasons' for the weight given to the opinion of a treating physician.") (citing 20 C.F.R. § 404.1527(d)(2)).

Based on the review of the record, this Court finds that the ALJ gave proper weight to Gillespie's opinions regarding plaintiff's ability to deal with work stresses and maintain attention and concentration, and that he did not substitute his judgment for plaintiff's treating therapist, Gillespie.  Gillespie filled out a (Mental) Functional Capacity Assessment Questionnaire of plaintiff, in which she checked that plaintiff had poor to no ability to deal with work stresses and to maintain attention and concentration.  (Tr. 261).  However, despite the fact that she was specifically asked to identify the particular medical or clinical findings (i.e. mental status, examination, behavior, intelligence, test results, symptoms) that supported her assessment of any limitations, (Tr. 261), Gillespie provided no support for these statements, except to list her four diagnoses of plaintiff.

More critically, however, Gillespie's treatment notes prior to and after her assessment are not consistent with her opinions of plaintiff's ability to concentrate and

handle work stress.  While in 2002, Gillespie's treatment records reflected that plaintiff was experiencing stress due to relationship issues, (Tr. 225, 227, 227A), her reports indicated that in 2003, plaintiff's stress and depression had improved.  (Tr. 220A, 221-22, 222A).  In this regard, on February 19, 2003, Gillespie noted plaintiff "looked and sounded probably the best I have seen her in terms of her physical appearance and her affect, and I do think the rehab helping her deal with her fibromyalgia and physical problems has helped with some of the depression."  (Tr. 220A).  On March 10, 3003, plaintiff stated that she felt better, and Gillespie stated plaintiff has "definitely made progress from when she first say Kay DelGreco and actually has improved these last few times that I've seen her partly because of what's been happening with her physical therapy.  This is definitely increased her physical well being as well as her emotional mental well being."  (Tr. 219A).  On March 25, 2003, Gillespie indicated that plaintiff was feeling much better and her depression was more under control.  (Tr. 218).  On June 17, 2003, plaintiff reported to Gillespie that she was feeling better and doing better, except for the recent stress of trying to find a missing child.  (Tr. 288-89).  On October 8, 2003, plaintiff reported she had a successful summer, but was now experiencing stress related to her boyfriend, children and financial issues.  (Tr. 287).  On October 31, 2003, the last time plaintiff saw Gillespie, plaintiff discussed with Gillespie her ability to work, the fact that she had signed on to be a bell ringer for the Salvation Army, home schooling her son, improvement with her symptoms of depression, and her concern that she could not take care of son and work at the same time.  (Tr. 285).  None of these treatment notes support Gillespie's opinion that plaintiff had no ability to concentrate or handle work stress.

Further, the ALJ did not make his decision about plaintiff's ability to handle stress and concentrate in a vacuum or without the support of other medical opinions.  The ALJ was permitted to rely on the opinions of the state agency physicians in assessing plaintiff's residual functional capacity.  See 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) (ALJs "consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts . . . .").

In this regard, Dr. Larson, state agency medical physician, found that plaintiff retained the capacity to concentrate on, understand, and remember routine, repetitive instructions, and that her ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.  (Tr. 215). In addition, while Dr. Larson reported that the clinical data supported a diagnosis of depression, he also noted that plaintiff was able to live with her sons, provide care for them, was able to perform household chores such as cooking, cleaning, and shopping, and could drive and handle money.  (Tr. 215).  Dr. Larson found plaintiff's concentration and stress tolerances were reduced, but that her overall level of function was sufficient for basic chores.  (Tr. 215).  Further, Dr. Larson found that plaintiff had not deteriorated in a work or work-like setting.  (Tr. 215).

Further, state psychologist, Dr. Frederiksen, after reviewing Gillespie's treatment records and plaintiff's most recent Activities of Daily Living Questionnaire, concluded that plaintiff retained the capacity to concentrate on three and four step and limited instructions, and that her ability to handle stress was moderately impaired but adequate to tolerate the routine stressors of a routine, repetitive and a three and occasionally four step work setting.   (T. 283).   Dr. Frederiksen also explicitly addressed why she

disagreed with Gillespie's opinions on work stress and ability to concentrate.    In particular, Dr. Frederiksen stated that Gillespie's therapy notes in 2003 not only indicated some improvement in plaintiff's mental condition, but that there were no overt symptoms of depression or problems with attention or concentration noted by Gillespie. (Tr. 277, 283).    Further, Dr. Frederiksen found that the primary limitations in stress tolerance were due to plaintiff's parenting of her two sons and not due to work.  (Tr. 277, 283).

As to the issue of attention and ability to concentrate, Dr. Frederiksen found that the records did not support a finding of poor attention or concentration.  To the contrary, she found that plaintiff was able to concentrate on goals of her choice (such as relationships) and that work was not a goal or focus.  (Tr. 277-78).  Dr. Frederiksen concluded that there was no indication of an increase in mental symptoms, no history of decompensation or job loss due to mental symptoms.  (Tr. 283).

Third, as the ALJ observed, plaintiff's limited course of medical treatment was not consistent with a disabling mental condition.  (Tr. 25).  In this regard, plaintiff reported that she was no longer taking medication for her depression.  (Tr. 355).  Further, plaintiff was not treating with a mental health specialist on an ongoing basis.  In fact, plaintiff treated with Gillespie on June 17, 2003, did not see Gillespie again until October 8, 2003, and then did not have any other visits with Gillespie prior to the hearing on June 10, 2004.  (Tr. 286, 288).

Finally, this Court finds, as did the ALJ, that plaintiff's daily activities were inconsistent with someone who has no ability to concentrate and cannot tolerate stress. In this regard, plaintiff had managed to home school her son who suffers from ADHD

and ODD, act as a sponsor for three adults through AA, cook, clean, drive, shop, care for her children, pay bills, and exercise, and attend AA meetings and church.

Based on the review of the entire record, this Court finds that there is substantial evidence in the record as a whole to support the ALJ's finding that Gillespie's opinion that plaintiff was not able to deal with work stresses and maintain attention and concentration was inconsistent with the overall objective medical evidence, medical history, and with her wide range of daily activities.   See Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (concluding that, "if substantial evidence supports the Secretary's position then it must be upheld" because the "Secretary has 'zone of choice' within which to operate") (quoting Steele v. Sullivan, 911 F.2d 115, 116 (8th Cir. 1990)). On this basis, this Court concludes that the ALJ's determination of plaintiff's RFC was supported by substantial evidence.

### C.     The Hypothetical Questions Posed to the VE

"Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence."   Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996). While a hypothetical must accurately set forth all of the claimant's impairments, the question need only include those limitations accepted by the ALJ as true.   Rappaport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).

Plaintiff argued that the ultimate result of the ALJ's improper substitution of his own opinion for that of Gillespie was an improper hypothetical question.  In this regard, plaintiff contends that the ALJ's hypothetical question to the VE did not accurately reflect the limitations imposed by plaintiff's impairments, namely her inability to deal with work stresses and maintain attention and concentration.

Since the Court has concluded that plaintiff's RFC was properly determined, the VE's testimony, which considered plaintiff's work experience and all her credible impairments and limitations, was appropriate. Therefore, the ALJ reasonably relied on the VE's testimony that plaintiff could perform her past relevant jobs as a receptionist or an insurance clerk, as customarily performed in the national economy.

### D.    Conflicts Between the Vocational Expert Testimony and the DOT

Plaintiff argued that the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). According to plaintiff, assuming that the hypothetical presented to the VE was an accurate description of plaintiff's impairments, the VE's answers did not constitute substantial evidence because the VE's answers—that plaintiff could perform the occupations of receptionist and insurance clerk—conflicted with the applicable DOT. Pl.'s Mem., at 9-10. That is, as described in the DOT, these occupations require abilities beyond the limitations contained in the ALJ's hypothetical question. Id. at 10. Because these inconsistencies were neither resolved, nor explained by the VE, plaintiff argued that the ALJ committed reversible error and the decision should be remanded back to the ALJ. Id. at 11.

The defendant does not dispute plaintiff's position that the VE's answers conflicted with the DOT. Rather the defendant argues that because no one pointed out the conflict to the ALJ prior to his decision, his decision should stand. Def.'s Mem., at 21-24. Alternatively, the defendant submits that the conflict is not serious enough to warrant questioning the ALJ's reliance on the VE's testimony. Id. at 23-24.

In 1995, the Eighth Circuit took the position that "when expert testimony conflicts with the DOT, the DOT controls." Smith v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995).

Later in 1995, and beyond, the Eighth Circuit softened its approach and held that even though the DOT generally controls, "[t]he DOT classifications may be rebutted . . . with VE testimony which shows that 'particular jobs, whether classified as light or sedentary, may be ones that a claimant can perform.'" Young v. Apfel, 221 F.3d 1065, 1070 (8th Cir. 2000) (citing Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995) (quoting Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995)).

On December 4, 2000, the Social Security Administration issued a Policy Interpretation Ruling, SSR 00-4p, Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (SSA December 4, 2000), which clarifies what an ALJ must do when there is a conflict between the VE's testimony and the DOT.  Id., 2000 WL 1898704, at *2.  In pertinent part, SSR 00-4p provides that resolving conflicts in occupational information shall be resolved as follows:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

Id.  Therefore, based on these regulations, this Court finds that as part of the duty of the ALJ to fully develop the record, ALJ must inquire during the hearing as to whether or not

there is an inconsistency between the VE's opinions and the DOT.  In addition, this regulation instructs that the Court must not blindly accept the DOT position over that of the VE, but must look to the ALJ's reasoning in determining whether to rely on the VE's testimony.

SSR 00-4p also expands on the responsibility of the ALJ to ask about conflicts between the VE's testimony and the DOT.  In this regard, the ruling provides:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Id.  Specifically, SSR 00-4p provides that an ALJ must explain in the decision how any conflict between the occupational evidence provided by the VE and information in the DOT "that has been identified was resolved."  Id.

Based on SSR 00-4p, the Court finds that the ALJ performed his duties at the hearing and is not required to re-open the record.  Here, the ALJ explicitly followed the provisions of SSR 00-4p when he asked the VE, "Okay, and is your testimony concerning the job classifications we've described here and in your report consistent with the Dictionary of Occupational Titles?," and the VE responded, "Yes, it is, Your Honor."  (Tr. 373).  No discrepancy was identified before the ALJ at the hearing. Because no conflicts were identified at the hearing, the ALJ had no conflicts to resolve and the ALJ properly relied on the VE's testimony.  Further, even though plaintiff has now identified conflicts between the VE's testimony and the DOT, by raising the conflict

in the context of cross-motions for summary judgment, this Court finds that it is too late and is not a basis for requiring the ALJ to re-open the record.  See Greenwood v. Barnhart, 433 F.Supp.2d 915, 930 (N.D. Ill. 2006) ("[r]aising a discrepancy only after the hearing . . . is too late.") (quoting Donahue v. Barnhart, 279 F.3d 441, 447 (7th Cir. 2002)).

## V.    RECOMMENDATION

For the reasons set forth above, this Court finds that the decision by the ALJ to deny plaintiff disability benefits is supported by substantial evidence on the record as a whole.  THEREFORE, IT IS RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 12] be DENIED.

2.    Defendant's Motion for Summary Judgment [Docket No. 15] be GRANTED.

Dated:      August 7, 2006

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **August 25, 2006** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.